**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JANET MIMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 11 C 1503 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| THERESA HOFFMAN, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

After a confrontation with Chicago police officers, Plaintiff Janet Mims was taken to Advocate Illinois Masonic Hospital for a psychiatric evaluation; afterward, she was involuntarily admitted to Chicago Read Mental Health Clinic for six days. Mims alleges that the police officers, Theresa Hoffman and Mariam Hamad, falsely arrested her in violation of the Fourth Amendment, and that they committed the torts of assault, battery, and intentional infliction of emotional distress. Mims also brings claims of false imprisonment, assault, battery, intentional infliction of emotional distress, and negligence against two doctors at Masonic Hospital, Melissa Gillespie and Brett Jones, and the hospital itself under the *respondeat superior* theory.[1] The officers and the City of Chicago have moved for partial summary judgment solely on the assault claim, for which Mims alleges the City is liable pursuant to the *respondeat superior* doctrine. The Masonic Hospital defendants move for summary judgment on all of Mims's claims.

---

[1] Dr. Yetunde Johnson and social worker Mickey Bowlan, defendants who worked at Chicago Read Clinic, and nurse Masonic Hospital nurse Diane Shalcross, who was never served, were dismissed from this case. *See* Dkt. # 71.

## FACTS

The following recitation of the facts is taken exclusively from the defendants' Local Rule 56.1(a)(3) Statements.[2] Mims did not respond file a response to either statement pursuant to Local Rule 56.1(b)(3)(A)-(B), nor any statement of additional material facts pursuant to Local Rule 56.1(b)(3)(C). As to the City defendants' statement, however, Mims states in her response brief that the facts as set forth by those defendants are "uncontested." Mem., Dkt # 84-1 at 2. She made no such explicit admission regarding the Masonic Hospital defendants' factual statement, but her failure to file any response to the statement (she also did not file any response brief) results in the admission of the facts set forth in it. *See* L.R. 56.1(b)(3)(C)("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012).

On June 16, 2010, at around 9:15 a.m., Mims left her home near the intersection of Leland Avenue and Rockwell Street to attend a job interview. About two blocks from her home, she saw two police cars parked on the street, alongside each other. Both cars' headlights were on, and the officers inside the cars were looking in Mims's direction. Mims believes that she has been harassed by the police in the past and has documented these instances with photographs. Mims took out her cell phone to take a picture of the squad cars. Before she took the picture, one of the squad cars drove away. Inside the remaining car was defendant Mariam Hamad.

After Mims took a picture of Hamad's squad car, she put her phone away and continued walking east on Leland Avenue. Officer Hamad turned off the squad car's headlights and followed Mims in the car. Yelling out the window, Hamad asked Mims why she was taking her

---

[2] The City defendants' facts concerning their encounter with the plaintiff are drawn almost exclusively from the plaintiff's deposition testimony.

picture. As Plaintiff arrived at the corner of Leland and Western, Hamad pulled her squad car on the curb, jumped out, and immediately "got in [Mims's] face." Hamad again asked why Mims had taken the picture and asked, "do you think I'm a Muslim terrorist?" Mims stated that it was not against the law to take a picture; she then took out her cell phone and took another photograph. Mims's hand shook as she held her cell phone, and Hamad laughed, asked Mims why she was shaking, and told her she must be scared. Hamad asked, "Do you think I'm going to hit you?"; Mims replied that she "hope[d] not" and that she had not done anything wrong.

Hamad again told Mims that she needed to know why Mims was taking her picture, and asked repeatedly if Mims thought she was a terrorist. Hamad was yelling and angry. Mims believed that Officer Hamad was going to hit her because Hamad was "in [Mims's] face."

Mims walked away, crossing the street to the east side of Western Avenue. Hamad got back in her squad car and followed Mims across the street, continuing to yell at Mims. At the bus stop on the corner of Leland and Western Avenue, Mims called 911 to request a sergeant to come to the scene as she was having a disturbance on the street with an officer. Plaintiff then took additional pictures, including of Hamad's squad car and a janitor at the nearly CTA station.

Defendant Therese Hoffman, a Chicago police sergeant, arrived on the scene after Mims' 911 call. Hoffman spoke with Hamad for about seven to ten minutes. Hoffman then approached Mims and got very close to her face. Hoffman started yelling at Mims, asking why she took a picture of Hamad. Hoffman pointed her finger in Mims' face and, at one point, stepped on Mims's foot, causing Mims to back away. Mims felt scared.

Hoffman told Mims that it was against the law to take a picture, and that they were going to "take her in." Hoffman also told Mims that they believed she was acting erratically and that there was something wrong with her. Mims replied that she was not acting erratically and that

3

they had no probable cause. Mims began to walk away but turned back to ask Sergeant Hoffman for her badge number. Hoffman said, "that's it." Hoffman and Hamad then grabbed Plaintiff and eventually handcuffed her and placed her inside Hamad's squad car.

The defendant officers took Mims to Advocate Illinois Masonic Hospital for the purpose of obtaining a mental health evaluation, pursuant to 405 ILCS 5/3-606, which permits peace officers to take such action if they have reasonable grounds to believe that a person is in need of immediate hospitalization to prevent harm to herself or others. Hoffman believed that Mims was not in full possession of her faculties, that she was not making sense or acting rationally, and that she was a danger to herself or others and was too unstable to take care for herself. Hamad also believed that Mims required hospitalization and that she was ill.

Upon her arrival, Mims was attended to by a nurse in the Emergency Department. Pursuant to the procedures for psychiatric patients, Mims was evaluated by a Crisis Team, including a social worker. The psychiatric evaluation documented "pressured speech, agitated motor responses, paranoid behavior, and refusal to cooperate."

Defendants Jones and Gillespie, both doctors, were working in the Emergency Department, and both evaluated Mims. Gillespie ordered a nurse to administer an anti-psychotic medication to Mims. Gillespie observed that Mims was suffering from some kind of psychosis and had to be stabilized for evaluation. The injection was the only physical contact Mims had with any staff from the hospital. Because she would not submit to evaluation and treatment, Mims was placed in restraints by the police officers for the protection of herself and the hospital staff. After receiving the injection, Mims calmed down, and the restraints were removed and never reapplied. Mims was in restraints for under 30 minutes.

Dr. Jones then evaluated Mims and determined that she was in need of mental health treatment and hospitalization. He noted that Mims had displayed poor impulse control, agitated affect, paranoid behavior, and pressured speech, and that she was aggressive, uncooperative, and agitated. Based on his evaluation, Dr. Jones certified that Mims was a person with mental illness who was reasonably expected to inflict harm on herself or others. Pursuant to that certification, Mims was transferred by ambulance from the hospital to Chicago Read Mental Health Center for further evaluation and treatment.

## DISCUSSION

Summary judgment is appropriate if the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011). When a summary judgment motion is submitted and supported by evidence as provided in Rule 56(c), the nonmoving party may not rest on mere allegations or denials in its pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Serednyj*, 656 F.3d at 547 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Although, as explained earlier, the defendants' factual statements are deemed admitted, the Court must still construe the facts in the light most favorable to Mims, the nonmoving party, and draw all reasonable inferences in her favor. *See Tebbens v. Mushol*, 692 F.3d 807, 815 (7th Cir. 2012) (citing *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 653 (7th Cir.2010)); *see also Keeton*, 667 F.3d at 884.

### I. City Defendants' Partial Motion for Summary Judgment on Assault Claim

The City defendants argue that Mims lacks sufficient evidence to permit a reasonable fact-finder to conclude that Sergeant Hoffman and Officer Hamad committed the tort of assault under Illinois law.[3]

The Illinois criminal code provides that an assault occurs "when, without lawful authority, [a person] knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1. The definition in the context of a civil case is the same: "With respect to civil liability, an 'assault' can be defined as an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." 3 *Ill. Law and Prac. Assault, Battery & Bodily Harm* § 1 (citing *Parrish by Bowker v. Donahue*, 110 Ill. App. 3d 1081, 443 N.E.2d 786 (3d Dist. 1982)). "Ever since the fourteenth century, assault whether civil or criminal has involved (1) a threatening gesture, or an otherwise innocent gesture made threatening by the accompanying words, that (2) creates a reasonable apprehension of an imminent battery." *Kijonka v. Seitzinger*, 363 F.3d 645, 647 (7th Cir. 2004) (Illinois law). "A merely verbal threat of indefinite action in the indefinite future is not an assault." *Id.*

Further, in order to pierce the tort immunity that applies to government employees as to claims for damages, the plaintiff must establish that the officers acted "willfully and wantonly."

---

[3] The Court appreciates that Rule 56(a) permits partial motions for summary judgment and that such motions can be an appropriate and useful way to narrow the issues for trial. Nevertheless, and putting aside the fact the Court's conclusion that summary judgment on the assault claim is not warranted, the Court questions the wisdom of expending the time and resources of the parties, counsel, and the Court to attempt to slice off such a tiny portion of the plaintiffs' claims, particularly when that claim is so closely related to those not challenged on summary judgment.

*See* 745 ILCS 10/2-202; *Chelios v. Heavener*, 520 F.3d 678, 692-93 (7th Cir. 2008). Willful and wanton conduct is a heightened state of mind requirement; the plaintiff must prove all of the elements of the tort and "either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Jane Doe-3 v. McLean County Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880, 887 (Ill. 2012); *see* 745 ILCS 10/1-210 ("'Willful and wanton conduct' as used in this Act means a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property"); Ill. Pattern Jury Instr. 14.01.

That definition requires further examination in the case of intentional torts, of which assault and battery are the quintessential examples. In this context, "intent" denotes that "the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Restatement (Second) of Torts* § 8A; *see American Family Mut. Ins. Co. v. Savickas,* 739 N.E.2d 445, 451 (Ill. 2000). The Illinois Supreme Court has been clear that willful and wanton conduct and intentionally tortious conduct are distinct concepts, but they fall on the same continuum. *See Ziarko v. Soo Line R. Co.*, 641 N.E. 2d 402, 406 (Ill. 1994) (plurality opinion; rationale subsequently endorsed by *Poole v. City of Rolling Meadows*, 656 N.E.2d 768, 771 (Ill. 1995) and *Murray v. Chicago Youth Center*, 864 N.E.2d 176, 191 (Ill. 2007)). Willful and wanton conduct includes, but is not limited to, intentional conduct. *Id*. Moreover, "under the facts of one case, willful and wanton misconduct may be only degrees more than ordinary negligence, while under the facts of another case, willful and wanton acts may be only degrees less than intentional wrongdoing." *Id.* What is clear, however, is that willful and wanton conduct, when not intentional, is at least a degree *less* than intentional. *See id*; *see also, e.g., Sparks v. Starks*, 856 N.E. 2d 575, 577-78 (Ill. App. Ct. 2006) ("willful and wanton

misconduct is essentially an aggravated form of negligence, regarded as a hybrid between conduct considered negligent and conduct considered intentionally tortious"); *Pomaro v. Community Consolidated School District 21*, 662 N.E.2d 438, 440 (Ill. App. Ct. 1995) ("willful and wanton conduct may lie anywhere between the parameters of intentional misconduct and mere negligence"). Accordingly, proving the intentional state of mind required for liability for assault or battery necessarily entails passing the point on the continuum where willful and wanton conduct resides before its overlap with intentional conduct begins. Therefore, the Court will not separately evaluate the states of mind here.

The defendants' motion is based almost entirely on the testimony of Mims herself; they contend that, even if it is true, Mims's testimony fails to establish the necessary elements of assault under Illinois law. Specifically they argue that Mims was not placed in reasonable apprehension of offensive physical contact because there was no benign or threatening "gesture" nor any threatening words. Mims, on the other hand, argues that an "on duty Police Officer, using physical intimidation, the authority of the uniform and verbal confrontation, suggests at its very core that the Plaintiff believed the Officer intended harm"; that "[t]he actions of the Officers . . . demonstrate intentional behavior that a reasonable person would apprehend as harmful or offensive contact"; and that "[t]he Defendant officer admits to placing the police car in the Plaintiff's path, forcing the Plaintiff to stop or alter directions," which "constitutes an assault." Mims contends that a jury could reasonably infer assault from these facts.

If it believed Mims's version of the facts as set forth (somewhat selectively) by the defendants, a jury could find one or both of the officers guilty of assault. According to Mims, she was not subject to lawful seizure or arrest at the time she interacted with the officers— and the officers placed no evidence before the Court to establish that they were effecting a valid seizure

at the time they confronted Mims. Thus, their conduct cannot be judged against what is reasonable behavior for police officers in the context of a valid arrest. Mims says she was not doing anything other than taking a photograph when the officers accosted her, and the City defendants have offered no contrary facts.

Therefore, it is possible for a reasonable jury to view Officer Hamad's use of the police car to obstruct Mim's path as a threatening gesture that placed the plaintiff in reasonable fear of a battery. Had the officer been in hot pursuit, that inference would not be reasonable. But the Court is required to accept that Mims did nothing more than walk by the officers and snap some photos—purely lawful conduct. *See Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 586 (7th Cir. 2012) ((explaining in challenge to eavesdropping law that "*Illinois does not prohibit taking silent video of police officers performing their duties in public*") (emphasis added)); *Zolicoffer v. City of Chicago*, No. 11 C 6362, 2013 WL 1181501, at * 3 (N.D. Ill. Mar. 20, 2013).

Furthermore, Mims testified that both officers yelled at her more or less continuously and "got in her face," which allows the inference that the officers came uncomfortably close to Mims. Again, if the officers were executing an arrest, then a reasonable person would not have feared an unjustified battery at this point; but that is not the set of facts before the Court at present. (Indeed, Mims contends she was unconstitutionally seized.) Hamad also referred to Mims' obvious fear that she would be struck and noted that Mims was shaking (perhaps out of fear, perhaps due to that agitated emotional state observed at the hospital). Hamad might have asked Mims, "Do you think I'm going to hit you?" because she thought such a belief was ridiculous; alternatively, she might have said it as a kind of intimidation. The cold record gives no clues, and this Court cannot draw inferences in the officers' favor. As for Sergeant Hoffman,

9

Mims testified that Hoffman pointed her finger in her face while standing close enough to step on her foot and yelling at her. Again, a jury might conclude on these facts that Mims reasonably feared offensive contact from Hoffman. Using the police car to divert Mims' path, "getting in her face" and yelling, and pointing at or stepping on Mims from close proximity could be perceived as "gestures" predicating an assault, outside the context of a valid law enforcement seizure.

The officers contend that Mims did not testify that she backed away or was afraid because she believed either of the officers was going to strike her. *See* Mem., Dkt # 77 at 7. In fact, Mims testified that she believed that Hamad was going to hit her and that she was "scared" when Hoffman berated her. In any case, "[w]hether the victim was placed in reasonable apprehension of receiving a battery is a question that the fact finder must resolve," and, moreover, "[i]n assessing reasonable apprehension, the victim need not testify expressly that he was in apprehension of receiving a battery." *In re Gino W.*, 354 Ill. App. 3d 775, 778, 822 N.E. 2d 592, 594 (2d Dist. 2005). Reasonable apprehension is decided from an objective standpoint and may be inferred from all the evidence at trial. *Id*. Therefore, this Court cannot conclude as a matter of law that no reasonable person would have been placed in apprehension of battery under these circumstances.

## II. Masonic Hospital Defendants' Motion for Summary Judgment on All Claims

The Masonic Hospital defendants—the two doctors and the hospital in its capacity as their employer—are alleged to have committed the state-law torts of assault, battery, false imprisonment, intentional infliction of emotional distress, and "negligence" (Counts II-VI of the Amended Complaint). The defendants argue that they are entitled to summary judgment because the evidence shows that Mims cannot establish the necessary elements of these claims as a matter of law. As noted already, Mims did not respond to these defendants' motion in any way.

Therefore, the facts as set forth by the defendants are admitted for purposes of this motion. Moreover, Mims's decision not to oppose the motion—a decision made when she was represented by counsel—operates as a forfeiture of any argument against the defendants' position.[4] This does not give rise to an automatic victory for the defendants, *see Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 331 (7th Cir.1993), but the Court will grant the defendants' motion if their arguments and supporting materials show that they are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(e)(3).

### A. Assault and Battery

Judgment for the Masonic Hospital defendants is warranted on the assault and battery claims. The elements of assault, set forth earlier, cannot be established against these defendants. There is no evidence of any threatening gesture made by either doctor, nor any evidence of benign gestures accompanied by threating words from them. *See Abbott v. Sangamon County*, 705 F.3d 706, 715 (7th Cir. 2013) ("Words alone seldom if ever are sufficient to constitute an assault; rather, there must be an accompanying gesture that is either inherently threatening or made so by the accompanying words."); *Kijonka*, 363 F.3d at 647. Without any evidence to create an issue of fact as to the Masonic Hospital defendants' version of events regarding what transpired in the Emergency Department, Mims simply cannot withstand summary judgment on the assault claim.

The same conclusion must be drawn as to the battery claim. In the medical context, battery has three elements: "(1) an intentional act on the part of the defendant; (2) a resulting offensive contact with the plaintiff's person; and (3) a lack of consent to the defendant's

---

[4] Failure to respond to a summary judgment motion also results in a forfeiture of any arguments on appeal. *See Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 407-08 (7th Cir. 2007); *Harper v. Vigilant Ins. Co.,* 433 F.3d 521, 528 (7th Cir. 2005).

conduct." *Sekerez v. Rush University Medical Center*, 954 N.E.2d 383, 394 (Ill. App. Ct. 2011) (*citing McNeil v. Brewer*, 710 N.E.2d 1285, 1288 (Ill. App. Ct. 1999). The third elements is satisfied when there is "a complete lack of consent to medical procedures performed, when the treatment is against the patient's will, [or] when the treatment is substantially at variance with the consent given." *Hernandez v. Schittek*, 713 N.E.2d 203, 207-208 (Ill. App. Ct. 1999) (internal quotation marks and citations omitted). In this case, there is no evidence of "offensive contact"—or any contact whatsoever—with Dr. Jones, so the claim against him ends there.

Dr. Gillespie caused contact by ordering an injection, so that element could be satisfied as to her. *See McNeil*, 710 N.E. 2d at 1288 (An "offensive contact" may be established by proof that defendant caused plaintiff to come into contact with a foreign substance in a manner which the plaintiff would reasonably regard as offensive.). And it is a fair inference from the facts set forth by the defendants that Mims did not consent to any treatment, including the injection. However, the record establishes—with no contradiction from Mims—that she was not able to give informed consent to any treatment. In these circumstances, Illinois common law insulates doctors for providing treatment.[5] "The emergency exception provides a defense to medical-battery claims asserted against medical professionals who render care in emergency situations." *In re Estate of Allen*, 848 N.E. 2d 202, 211 (Ill. App. Ct. 2006). Under the exception, a doctor "is not required to obtain consent to medically treat a patient if an emergency arises and treatment is required in order to protect the patient's health, and it is impossible or impractical to obtain consent either from the patient or from someone authorized to consent for him." *Id*. (citing Ill. Pattern Jury Instr. Civil, No. 105.07 (2005)). Here the evidence establishes that Dr. Gillespie

---

[5] There is statutory immunity as well, but it typically does not apply in the hospital settings because it applies to emergency medical providers who do not receive any fee. *See* 210 ILCS 50/3.150; *Home Star Bank & Financial Services v. Emergency Care and Health Organization, Ltd.*, 983 N.E.2d 45, 57 (Ill. App. Ct. 2012).

12

believed the treatment was needed (she observed that Mims was suffering from some sort of psychosis and needed to be stabilized so that she could be evaluated) and that Mims could not consent. Again, Mims's view might be different, but she provided no evidence or argument to rebut the doctors' motion. Therefore, judgment for Dr. Gillespie is also warranted.

### B.     False Imprisonment

"The elements of a cause of action for false imprisonment are that the plaintiff was restrained or arrested by the defendant, and the defendant acted without reasonable grounds to believe that an offense was committed by the plaintiff." *Poris v. Lake Holiday Property Owners Ass'n*, 983 N.E.2d 993, 1007 (Ill. 2013). These elements, and the fact that "probable cause is an absolute bar to a claim of false imprisonment," *id.*, suggest that despite its assertion against all defendants, Count IV is most aptly directed at the police officers (who have not contested it in their summary-judgment motion), not the Masonic Hospital defendants. Nevertheless, the Hospital defendants engage with the merits of the claim, arguing that false imprisonment cannot be proven against them because their restraint of the plaintiff—keeping her in the Emergency Department and certifying her for admission to Chicago Read—was pursuant to lawful statutory authority.

The defendants' reasoning is sound. Plaintiff was treated at Illinois Masonic and transported to Chicago Read pursuant to the Illinois Mental Health Code.  The Code provides: "A person 18 years of age or older who is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization may be admitted to a mental health facility pursuant to this Article." The required certification was provided by Dr. Jones. *See id*. § 3-602. Moreover, the treaters are immune from civil and criminal liability. 405 ILCS 5/6-103(a) ("All persons acting in good faith and without negligence in connection with the preparation of applications,

petitions, certificates or other documents, for the apprehension, transportation, examination, treatment, habilitation, detention or discharge of an individual under the provisions of this Act incur no liability, civil or criminal, by reason of such acts.") Based on the facts before the Court, there is no basis on which to conclude that the doctors did not act "in good faith and without negligence"; therefore, they are immune from liability as a matter of law for the actions on which a false imprisonment claim could be based.

      **C.**      **Intentional Infliction of Emotional Distress (IIED)**

To succeed on a claim of IIED under Illinois law, the plaintiff must prove: "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by plaintiff was severe; and (3) that defendant's conduct was such that defendant knew that severe emotional distress would be certain or substantially certain to result." *Heying v. Simonatis*, 466 N.E. 2d 1137, 1143 (Ill. App. Ct. 1984). The "outrageous conduct must extend beyond mere insults, indignities, threats, annoyances, petty oppressions or trivialities; [it] must be so extreme in degree as to go beyond all possible bounds of decency." *Id.* (quotation marks omitted).

Mims does not explain the basis of her IIED claim; the Masonic Hospital defendants guess that it has to do with her testimony that she was forced to disrobe and then don a hospital gown in the Emergency Department. They are correct that the plaintiff's claim fails on that score because, according to the record, Drs. Gillespie and Jones had nothing to do with Mims' initial intake process. As for their treatment of Mims, including Dr. Gillespie's prescription of injected medication and Dr. Jones's certification of Mims for involuntary admission, the Court discerns no action that can be deemed extreme and outrageous. Nor is there a basis in the record on which to infer that the doctors should have known that their provision of medical treatment to a patient would result in severe emotional distress. To the contrary, the evidence of record supports only

the inference that the doctors were seeking to alleviate Mims's distress. With both of those crucial elements lacking, the Court must grant summary judgment for the defendants.

### D. Negligence

Count VI of the Amended Complaint is for "Negligence." Like the other counts, it incorporates every factual allegation in the complaint but provides no clue as to which specific conduct, by whom, is alleged to be negligent, or how. Understandably, the Masonic Hospital defendants interpret the claim as one of medical malpractice, and absent adequate direction from the plaintiff, the Court will follow suit.

The essence of medical negligence is a violation of the standard of care; that is, the failure to act with the same degree of knowledge, skill, and ability as an ordinarily careful professional under similar circumstances. *See LaSalle Bank, N.A. v. C/HCA Development Corp.*, 893 N.E.2d 949, 960 (Ill. App. Ct. 2008). "In a medical negligence action, a plaintiff must prove the following three elements: (1) the proper standard of care by which to measure defendants' conduct; (2) a negligent breach of that standard of care by defendants; and (3) proximate cause." *Id.* at 970. "Ordinarily, the proof of all three elements in a medical negligence action requires the testimony of medical experts." *Id.* (citing cases); *Willaby v. Bendersky*, 891 N.E.2d 509, 519 (Ill. App. Ct. 2008). The defendants rightly point out that the plaintiff has adduced no evidence of the appropriate standard of care, let alone identified any conduct that could be a breach of that standard. Nor is this a case in which the deviation is so obvious that lay person could identify it based on his or her common knowledge. *See Willaby*, 891 N.E. 2d at 521 ("An expert witness is not required where the defendant's actions are grossly apparent or where the treatment is so common that a layperson would understand the conduct without the necessity of an expert."). The facts here are nothing like the obvious negligence of leaving a sponge inside a surgical

patient's body, *see id.*, and without expert testimony, no rational jury could conclude that either doctor failed to adhere to the applicable standard of care. Accordingly, judgment must be entered for the defendants on the negligence claim.

### E. *Respondeat Superior*

Count VII of the Amended Complaint seeks to hold Illinois Masonic Hospital liable for the torts of Drs. Gillespie and Jones (the only remaining individual Masonic Hospital defendants) via *respondeat superior*. As a matter of law, the Court must enter judgment for the hospital because the doctors are not liable on any of Mims's claims. "When an action is brought against a master based on allegedly negligent acts of the servant and no independent wrong is charged on behalf of the master, liability is entirely derivative, being founded upon the doctrine of *respondeat superior*." *Moy v. County of Cook*, 640 N.E.2d 926, 928 (Ill. 1994); *Towns v. Yellow Cab Co.*, 382 N.E.2d 1217, 1221 (Ill. 1978) (Under *respondeat superior*, "any legal claim against the master must be said to be identical to that which the plaintiff may have asserted against the servant"). Absent liability for the employee-doctors, there can be none for the hospital. Accordingly, the Court grants summary judgment for Masonic Hospital, too.

* * *

For the reasons set forth in this opinion, the Court denies the Chicago defendants' motion for partial summary judgment and grants the Masonic Hospital defendants' motion for summary judgment on all the claims against them.

Date: September 27, 2013

John J. Tharp, Jr.
United States District Judge